Welcome to Honolulu. It's my home community here. I did fly in from Utah. Dr. Sancho flew in from Barcelona. Mr. Arbaugh flew in from Washington, D.C., and I understand you folks flew in from San Francisco. So it's a nice place to meet for discussing the Large Hadron Collider in Switzerland. I want to recapitulate where we are with the situation of the Large Hadron Collider. As this group might be aware, in the fall of 2008, there was an unlikely accident that occurred that basically destroyed the machine, or large portions of the machine, and it was shut down for repair for about a year and a half. And we're doing retrofit, remodification, so that they won't have that happen again. It's now currently operating at half the energy. It has not yet entered into the regime of engaging in dangerous collisions of the kind that we have sought to enjoin. That is anticipated to occur this coming winter if no action is taken. Counselor, try to explain to us exactly what role the United States plays in all this. I understand it has something like a 10% interest? Yes, Your Honor. The United States has funded approximately 10% of the construction costs, and it continues to fund the operational costs of some of the experimentation that is anticipated to be taken there. Could we enjoin anything more than further monetary contributions? The United States doesn't have any role in the operations, is that right? It does have a role in the operation. The experimentation cannot proceed, or the operation is essentially moot, if the United States' involvement in the experimentation is not there. There are four experimental chambers, which the United States operates two of them. There is the machine, and then there are the experimental chambers, and they are integrated with each other. One cannot operate without the other. The United States operates two of those experimental chambers and continues funding on that. In addition, the equipment that the United States has already funded, paid for, and is sitting there, the United States has an obligation to maintain that, should there be repairs and so forth of that equipment for the machine itself. Okay. Okay. Sure. All right. In a minute. Anyway, does that answer your question, Your Honor? Well, it's quite unclear to me exactly. If we said, United States, get out of this, you can't participate any further, would the proceedings go ahead with the other participants? We don't know what they would do. They might continue, but they would not be able to continue in the manner in which they are doing. The United States additionally has jurisdiction, Your Honor, under the Patriot Act and under the United States Code, Section 831, over nuclear substances, where the United States can intervene in actions in foreign countries that involve threats to U.S. citizens involved in nuclear materials. And this is essential, what this is. So you're asking us to authorize an invasion? Absolutely not. I have real trouble understanding how exactly the Patriot Act applies to this. Well, the Patriot Act confers jurisdiction over anything that's going on anywhere in the world, essentially. It confers jurisdiction to the federal court? Does the federal court have jurisdiction over the U.S. military? I believe it does. And the U.S. military intervenes all over the globe under the Patriot Act. So we have the power to tell the military what to do? It's just a general, broad proposition? I understand you don't practice law. I went to law school. Doesn't that sound like a pretty unlikely, broad proposition? I mean, we are a court of limited jurisdiction. What is the source of our authority that you want us to use? The source of your authority that I've sought for this court to use is the NEPA, Your Honor, as is detailed in the briefing, the National Environmental Protection Act. This is essentially the same source of authority that we give this court jurisdiction over British Petroleum when they sought to obtain a drilling permit from the Rain Management Service, arguing that they should be exempted from NEPA because of the unlikely scenario of having an environmental disaster. I brought that up as a reason for being excused from the obligations of NEPA. Yes, and that's essentially the same argument. We certainly have control over the Gulf. Yes, we do. We don't have control over Switzerland. We do over the money that flows into Switzerland, and that's the control we're asking. What we're asking is that the U.S. stop its funding. We're not asking that the U.S. go in and invade Switzerland. No, that's not what we're asking. Has there been any NEPA review? There has been no NEPA review. And that's what we're asking, that this court uphold the law, enforce NEPA, and allow it. I'd like Dr. Satcher to use his five minutes, if I may. Well, I was intending to read a long statement, but there is not much time here. On your question on jurisdiction, I think this will be jurisdiction according to NEPA, and I think the comparison with the British petroleum spill is clear. If there is a spill of black holes or strange sludge in this machine, there is no way to stop that. There is no safety measure taken by this company. That's why the company is denying the risk. I want to stress four points. The truth, the explosive truth about this machine is that it's both a research machine and an experimental weapon, in the sense that these machines are used to create nuclear explosives and study the particles that come out of that. The question with those new nuclear explosives and this machine is that the two nuclear substances we fear, black holes and strange sludge, they are self-filling bombs that fill in the mass of the Earth. They provoke supernova explosions and big bombs. So, if there is a spill of those substances, and there is a lot of theoretical work backing it by Mr. Einstein, who is the founder of the theory of black holes and quark-strange condensates, which CERN denies and is bringing a series of theories that are not true, like Mr. Hawking who denied Mr. Einstein, if the standard science, which is the science that should be upheld in a court, is right, any spill of those substances will provoke the destruction of the Earth, because those substances will fall to the center of the Earth and fill on the matter of this planet. That's why, unlike British Petroleum that is trying to cap this thing, there is no way to cap this thing. That's why there are, for me, a series of new obligations which didn't follow the company. Environmental Laws in Europe, which asked for a panel of independent scientists to evaluate the risk of this machine, they were not also followed, because the risks are so huge, there is only a possibility of denial. Denial of the risk, denial of standard Einstein's theory of black holes, and, of course, denial of any standard authority to the company. The possibility of applying the Patriot Act or the U.S. Code Section 831, which states, quote, the nature of nuclear contamination is such that it may affect the health, and the acts that constitute the illegal activity occur outside the territory of the United States and are primarily directed towards foreign nationals. So, even in a foreign territory, the United States, if there is a huge risk, like in this case, could interfere. Of course, I don't ask for a political intervention. What can the court do to redress the problem you are identifying? Well, miscellaneous rumors say that this will be addressed by politicians, which is what I think. If politicians knew the truth, both in Europe, our allies, and here in America, they would address politicians and administrators. The court cannot be able to tell politicians to do. As a judge, I don't have the power to say, you politicians, you enact this law. I know, but a positive jurisdictional suit on this matter would alert politicians, take seriously the matter, study it, review it with independent scientists, and realize this is a nuclear company with a lot of interest, industrial interest, scientific interest, bureaucratic interest, that is not responding to the loss of NEPA, to the obligations of environmental loss in Europe. It's lying to the public, and it's just playing like any big company, taking a big risk on lives, expecting that nothing happens. There's no prevention in this company. There's no safety at all. So the only thing we ask the court is to accept jurisdiction under NEPA, because they did violate NEPA. We allow this to become a serious matter, because it is a serious matter. Are you acquainted with the doctrine of standing? What? Standing. Doctrine of standing? Standing to sue. I don't understand your question. Or maybe your partner does. You know, I'm familiar with the doctrine of standing, yes, and we are standing to sue because we are citizens of the United States. I am a citizen of the United States. Dr. Zanzibari is not a citizen of the United States. He is a resident of the United States, and so we have standing under NEPA. You think that being a citizen of the United States gives you standing? It gives me standing. Any citizen of the United States can come up here and say, No, that's not what I'm saying. The standing arises from the fact that this activity in Switzerland will affect me here in the United States, even here in Hawaii, where the suit was filed, because should it create this kind of a condition of creating strange events, it would affect me here in Hawaii, and that's what gives me standing. Not the fact that they're doing something in Switzerland, but that what they're doing in Switzerland can affect me here in Hawaii. That's what gives us standing. But there's an element of speculation there, is there not? It's a 50-50, so far as we know. There's an element of speculation on Artist Dr. Sancho as well. And please, standard science in this case is Mr. Einstein. This is not a speculation. It's standard science. When we switch lights, lights come always on. This is standard science. Speculation is what Sancho is saying. Mr. Hawking is not a Nobel Prize winner, has been proved, and Mr. Einstein says that they will destroy the Earth. So, speculation is on the side of standard science. Let's hear from the government now. May I read one very brief quote that was in your latest brief? I can't stop you, because you look a little like Judge Reinhold. I apologize for that, Your Honor. That's exactly what I was... I feel sorry for Mr. Stanley. Then, let me read very briefly. This is what Sheldon Glashow wrote. The Stranglitz disaster scenario described by Glashow and Glashow would only be credible if Stranglitz exists, which is conceivable then, if they form these mysterious elements, which is unlikely. That's the weasel word. And if they are negatively uncharged, unlikely. Again, the weasel word. It's less than 50% chance. Given that currently Stranglitz carries positive charges, and if tiny strangers can be created at will, then there might just be a problem. A newborn stranger could engulf atomic nuclei, going relentlessly and ultimately consuming the entire Earth. Okay, that was from... The Amicus Q&A, Sheldon Glashow and Robert Wilson co-authored a paper taken seriously in Nature magazine that was then quoted in the Amicus brief from that paper. So you went to school where? I went to a lot of places. I teach school, and I went to school at UC Berkeley as a physics major initially, a degree in biology. And where did you go to law school? I went to law school in Sacramento, several schools. McGeorge School of Law, Lincoln University, Lorenzo Pantino School of Law. Thank you. You sounded like a Berkeley guy. I don't know if that's a compliment, Your Honor. I take that as a compliment. I'm a Berkeley graduate, so... Yes, and I did graduate research at Berkeley, and then I worked probably on the federal payroll before you were. Oh, yeah? When did you go? 1979. I've been on the payroll since 1941. I apologize. I'll get it back. Okay. But it's been a while. What? It's been a while. Thank you. You know, it's... When did you start? When did I start what? 71? Law school? No, no, on the payroll. 79, yeah, it's been a while. You've been paying your taxes. Yes, I got off the payroll after five years. Okay. All right. Thank you, Your Honor. The gentleman here has been on the payroll, I don't think, since 79, certainly not as long as you. Yeah. Well... Well, you're carrying the future of the... the future of the world under your shoulder. I feel like I have a great responsibility here this morning, Your Honor, and I only have ten minutes in which to discharge it. I'm John Arbab on behalf of the... What Einstein said, I think that, you know, time isn't a factor. Right, time is relative and the clock can always keep running. It's irrelevant, really. If I might... That's what I tell people when I'm late. Which is constant. I'm a constant force. Your Honor, I would like to try to refocus on the legal issues that are actually involved in this appeal. How about standing? Do you want to address that? I would like to because that's the first issue that really must be addressed. All right. As we discussed in the brief, there's a serious standing problem with the plaintiff's ability to bring the suit based on the redressability and causation requirements of Article III standing. The basic problem is that the suit seeks an order from a federal court enjoining further operation of the LHC. The problem is that the only entity with authority to do that is not any of the federal defendants but CERN, who is not a defendant in this case. So the alleged harm, the operation of the LHC, is not fairly traceable to either of the federal appellees. Kind of explain to us the structure and what participation the United States has. Apparently it operates a couple of experimental laboratories. Your Honor, there's some confusion in the briefing about this, but I think the facts are pretty simple according to the records. The facts are pretty simple, although there's been some confusion in the briefing about this point. First of all, as the district court found, the two federal agencies here, Department of Energy and National Science Foundation, contributed a very small amount of the total construction costs of the LHC, less than 10 percent. A very small proportion, but I have difficulty saying it's a small amount, over a half billion dollars. It's about $530 million, Your Honor, but under the circuit's case law, the relevant comparison is not just the figure in the abstract, it's how it measures up compared to the total expenditure of all parties, including the non-federal contributors. And here, as in many of the court's cases, like Rattlesnake Coalition, Kamakani, Friends of the Earth, the percentage of the government's contribution is... Is there any case where the number of dollars is in nine digits that's been held not to be a major federal action? Well, I just don't think that's your strong point with regard to standing. Your Honor, this issue would not go to standing. This goes to whether the LHC is a major federal action, which would be the merits issue, assuming that one of the plaintiffs had standing. You want to talk about standing? Yes, I was just answering Judge Fletcher's question about the exact nature of the government's involvement in the project. So there's the construction, the small percentage of construction funding, which is less than 10 percent. And the relevance of that is, as I said, major federal action is not indicated where such a small percentage is federal funding. I guess I'm more interested in what operational things that it currently is doing. Yes, Your Honor. As we discussed in the brief and as is detailed in the declaration of Dr. Strauss, the Department of Energy has, subject to funding from Congress, has in the past, in fiscal year 2009, allocated some monies toward support of U.S. scientists doing research on two of the four detectors. But that's completely unrelated to the gravamen of the suit, which is that the plaintiffs don't want the accelerator itself to operate. The accelerator operates irrespective of whether the U.S. scientists participate in research on two of the four detectors. And that's quite clear from the Strauss declaration. He states that even if the... I'm sorry. The Strauss declaration makes clear that even if the U.S. scientists who are doing research on two of the four detectors packed their bags and went home tomorrow, the LHC would still continue to operate. It's not as if this kind of support for U.S. researchers has any effect on whether the LHC will continue to operate or not. So that fact is relevant for two reasons. First, as to standing, it only reinforces the problem here with redressability and causation. And secondly, it also reinforces the point that the LHC is not a major federal action because it indicates that the federal agencies have no control or authority  They fund some scientists doing research on the detectors and that's it. So based on the record that was compiled before the district court, it's quite clear that neither plaintiff had standing, even assuming that Mr. Sancho is still an appellant involved in this case on appeal. I think the only other point that I would like to make, unless there are further questions, goes to the major federal action question. Even assuming that the plaintiffs, at least one of the plaintiffs, did have standing to bring the suit, they're asking that NEPA be applied here. And NEPA is not applied, it's not even triggered, unless the project at issue is a so-called major federal action under the text of NEPA. Here the district court probably found that the two important guideposts on the major federal action question come in favor of a conclusion that the LHC is not a major federal action. Again, the first factor being the minimal amount of federal funding as a percentage of the whole. And secondly, the fact that the federal agencies have no control over the operation or management of the LHC, that authority being vested exclusively in CERN, who's not even a defendant here. So unless there are further questions, I would just ask that the judgment below be affirmed. All right. Thank you. Thank you. I'm not sure if I used up our ten minutes. I'd like to take one minute for rebuttal, if I may. Well, the government cedes two minutes to you. Thank you. Oh, wonderful. He says CERN is not a defendant. CERN is a defendant. CERN, as a defendant, defaulted at the trial court level, did not appear in court, but it is a defendant. And basically they did not want to show up and argue their case. And so they are a defendant. They weren't properly served. That's what they subsequently, the government has complained that they were not properly served. And we never really delved into that issue in depth at the trial court level because it went up on appeal before we did so. I believe they weren't properly served, but we'll go with we can only serve them again if it gets back to the trial court, or when it gets back to the trial court. And as for the standing, yes, the government has conceded that the U.S. government is continuing to fund two of those four detectors. And those are integral parts of the operation. There's no point in operating the machine if you're not going to have the detector there. It's integral to it. And so it's sort of like having a car. Somebody else fund those portions of the project? Pardon? Could somebody else fund those portions of the project? I'm sure other persons could always step in. The U.S. could have never funded it in the first place. Maybe something might have happened, but those aren't the facts. That's what could have happened. Now, wait a minute. I think what we're dealing with here is a question of whether the United States has a finger on an on-off button. You concede the United States does not have a finger on an on-off button. It does, very much so, because if the detectors are off, the machine goes off. You just told me somebody else could fund that. May Mr. Satcher respond? According to the administrative rules of CERN, if this huge quantity of $500 million disappears, it will be an entire reschedule of all the systems. It will have to appropriate money from the European Union, which is not very interested in giving more money for this thing. And so it will really haul the machine and put the issue into the scientific community again. So it will really affect tremendously this machine. It won't work. Essentially, we wouldn't be asking this court to issue or sending it back to the trial court for the trial court to issue injunctive relief if we're going to think of doing anything. We're very confident that should the trial court issue injunctive relief, ordering a NEPA or affirming that NEPA was required, that they need to follow NEPA, we don't know what the outcome of NEPA will be. It might very well be that, okay, we go through all the procedures, and if everybody's on board with taking that risk, then that would be the outcome. But we don't know what that outcome will be. That's the same as British Petroleum. Perhaps if they'd gone through the NEPA procedure, everybody would have gone on board, let's take the risk. But that's not saying that that's what the law is. The law requires that this be reviewed. Thank you. I've got eight seconds left. Thank you very kindly for your time, and I appreciate your cordiality. Thank you. It's interesting. The matter is submitted, and we'll call the next matter United States of America versus Pino Anapa. Thank you very much. Thank you.
judges: Fletcher B. , Pregerson, Clifton